NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DONNA JUSSEN,

Plaintiff,

v.

ATLANTIC HEALTH SYSTEM et al.,

Defendants.

Civil Action No. 21-20633 (RK) (TJB)

**OPINION**

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the Motion for Summary Judgment ("Motion") brought by Defendants Atlantic Health System, Patricia Acevedo, and Eileen Moran (collectively, "Defendants"). ("MSJ," ECF No. 36-1.) Plaintiff Donna Jussen ("Ms. Jussen" or "Plaintiff") opposed the motion, ("Opp.," ECF No. 40-1), and Defendants replied, ("Reply," ECF No. 44). In support of their Motion and in accordance with Local Civil Rule 56.1(a), Defendants filed a Statement of Undisputed Material Facts, ("D-SOF," ECF No. 36-2), to which Plaintiff filed a response, ("Resp. to D-SOF," ECF No. 40), and Defendants filed a subsequent reply, ("Reply to D-SOF," ECF No. 44-1). Plaintiff also filed a Supplemental Statement of Material Facts, ("P-SSOF," ECF No. 40-2), to which Defendants filed a Response, ("Resp. to P-SSOF," ECF No. 44-2). The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons below, Defendants' Motion for Summary Judgment is **GRANTED**.

I.    **BACKGROUND**

A.    FACTUAL BACKGROUND

This case centers on Defendants' motivations to terminate Plaintiff's employment on March 8, 2021, the day Plaintiff returned to work after two months of medical leave under the Family and Medical Leave Act ("FMLA"). On May 6, 2019, Plaintiff began her employment with Defendant Atlantic Health System ("AHS") as "a unit associate scheduling home healthcare aides and hospice workers in Sussex and Warren Counties." (D-SOF ¶ 1; P-SSOF ¶ 2.) Plaintiff's position required her to work with AHS aides, homebound patients, and patient families to schedule home visits and create "care plans" for those patients. (D-SOF ¶ 2; P-SSOF ¶ 2.) The position required Plaintiff to possess and maintain "excellent communicative and customer service skills" in scheduling aides and communicating with AHS clients. (D-SOF ¶ 3; Resp. to D-SOF ¶ 3.)

As part of her employment, Plaintiff agreed to abide by AHS's "Code of Ethics and Corporate Compliance Program," which prohibited, among other things, "[t]he use of profanity within hearing distance of patients or visitors" and "[a]ggressive actions or behaviors." (D-SOF ¶¶ 46–47; Resp. to D-SOF ¶¶ 46–47.) The AHS Code of Ethics also provided, and Plaintiff agreed, that "[v]iolations of the Code by any team member affiliated with, or employed by, Atlantic Health System will be addressed in accordance with our policies." (*Id.*) Those AHS human resources ("HR") policies, which Plaintiff reviewed during her employment, provided a disciplinary process for addressing various employee infractions via, relevant here, "counseling" with supervisors— which included verbal or written reprimands. (D-SOF ¶¶ 48–49; Resp. to D-SOF ¶¶ 48–49.) The HR policy provided a non-exhaustive list of infractions, including "[u]se of threatening, abusive or profane language[, n]ot performing assigned duties in an appropriate manner or at assigned

2

times[, a]ctions or behaviors that harm or could harm Atlantic Health System operations, patients, or others[, n]ot complying with any Atlantic Health System policies or procedures[, and o]ther acts or behavior or conduct of like severity to those above, as decided by Atlantic Health System." (D-SOF ¶ 47 (bullets omitted); Resp. to D-SOF ¶ 47.)

AHS's counseling policy incorporated four common, escalating steps to address this misconduct: (1) a "verbal counseling," (2) a "written counseling," (3) a "final counseling," and (4) termination of employment. (D-SOF ¶ 48; Resp. to D-SOF ¶ 48.) This counseling hierarchy was not rigid or required, as it specifically qualified that it did not "affect the employment-at-will status of all team members. The employment of any team member may end at any time with or without notice or cause by the team member's choice or by Atlantic Health System." (*Id.*) Moreover, even within the four-step counseling process, the policy made clear that the appropriate "step of counseling" depends on a number of factors about the infraction and employee—his or her intent, knowledge, performance, counseling history, etc.—which may allow "one or more steps in the process to be skipped." (*Id.*) This includes "immediate[]" termination "if the behavior warrants it." (*Id.*)

### 1. Defendant Acevedo's "Targeting" of Plaintiff

On January 31, 2020, Plaintiff's son tragically died. (P-SSOF ¶ 11; Resp. to P-SSOF ¶ 11.) Plaintiff took a month-and-a-half bereavement leave from work, returning to work on March 17, 2020.[1] (*Id.*) Plaintiff testified that upon her return, her relationship with her supervisor, Defendant Patricia Acevedo, changed. (Pl. Dep. 167:20–168:22.)[2] Plaintiff testified that she felt as if Ms.

---

[1] For clarity, Plaintiff's bereavement leave in March 2020 is not specifically at issue in this case.

[2] The parties filed numerous deposition transcripts under seal in support of their briefing. (*See* "Pl. Dep.," ECF No. 41-1 at 2–91 & ECF No. 41-2 at 2–36; "Acevedo Dep. Vol. I," ECF No. 41-2 at 38–65; "Acevedo Dep. Vol. II," ECF No. 41-3 at 2–42; "Moran Dep.," ECF No. 41-3 at 44–63; "Shaheed Dep. Vol. I," ECF

Acevedo was questioning her every decision, even on routine tasks that were "never questioned before."[3] (D-SOF ¶ 52; Resp. to D-SOF ¶ 52.) Further, Plaintiff testified that Ms. Acevedo made comments about Plaintiff's demeanor at work: that Plaintiff was not the same as she was prior to her son passing away, that Plaintiff was not smiling as much, that she "want[ed] the old Donna back," and that Plaintiff needed to "[s]nap out of it."[4] (D-SOF ¶¶ 56–57; Resp. to D-SOF ¶¶ 56–57.) Plaintiff testified that Ms. Acevedo made such comments in the workplace "approximately 20" times following her return from bereavement leave, though she could not remember further specifics about the interactions.[5] (Pl. Dep. 169:7–180:21. *But see* Opp. at 13 (asserting that Ms. Acevedo made these comments "at least ten" times).) Plaintiff also testified that Ms. Acevedo's supervisor, Defendant Eileen Moran, commented—in a "concerned" and "sincere" way—in about

---

No. 41-3 at 65–90; "Shaheed Dep. Vol. II," ECF No. 45 at 16–40.) The Court herein cites these deposition transcripts using deponent name and, where applicable, volume number.

[3] Although she did not testify regarding Ms. Acevedo's alleged comments, Plaintiff's co-worker Ayesha Shaheed testified that Plaintiff's son's death had a noticeable effect on Plaintiff's well-being at work, and that Ms. Acevedo was asking Plaintiff to handle "more duties" within their department—including "supplies, . . . printing things and organizing things." (Shaheed Dep. Vol. I. 35:13–37:19.) Defendants dispute Plaintiff's reliance on Ms. Shaheed's statements as indicating an uneven workload between different members of the department, particularly for Plaintiff. (*See* Resp. to P-SSOF ¶ 16; ECF No. 45 at 9–10 (listing different job responsibilities for Ayesha Shaheed and Plaintiff).) Because Plaintiff herself testified that these additional responsibilities were, in fact, part of her job duties, there is no genuine issue of material fact that the tasks to which Ms. Shaheed refers were indeed part of Plaintiff's bona fide job responsibilities. (*See* Pl. Dep. 49:24–77:14.) Further, Ms. Shaheed in no way suggests that Ms. Acevedo assigned Plaintiff these tasks because of Plaintiff's changed demeanor following the death of her son.

[4] While there is no dispute that Plaintiff *testified* about Ms. Acevedo's comments regarding her demeanor at work, (D-SOF ¶¶ 56–57; Resp. to D-SOF ¶¶ 56–57), there is a dispute as to whether Ms. Acevedo made such comments at all, (MSJ at 10; Acevedo Dep. Vol. II 22:9–23, 46:22–47:10), and whether Ms. Acevedo made the comments with specific reference to Plaintiff's son's passing, (Resp. to P-SSOF ¶¶ 14–15). Even crediting Plaintiff's version, for the reasons discussed below, Ms. Acevedo's comments alone are insufficient to raise a genuine dispute of material fact supporting an actionable claim of unlawful discrimination relating to her termination of employment under NJLAD.

[5] Plaintiff testified that the first time Ms. Acevedo made this comment, her co-workers Ayesha Shaheed and Stacy Holdorf were present. (Pl. Dep. 170:5–9.) However, there is no testimony in the record from either Ms. Shaheed—who was deposed twice—or Ms. Holdorf corroborating this incident.

August 2020 that Plaintiff was "not the same person since [her] son had passed away" and that Plaintiff needed to take care of her mental health issues.[6] (D-SOF ¶ 58; Resp. to D-SOF ¶ 58.)

In addition to Ms. Acevedo's comments, Plaintiff asserts that Ms. Acevedo unfairly disciplined her a number of times following her return from bereavement leave. On March 31, 2020, Plaintiff, scheduled to work remotely over the weekend, realized that her phone was not receiving forwarded calls. (P-SSOF ¶ 26; Resp. to P-SSOF ¶ 26.) When Plaintiff informed Ms. Acevedo of the issue, Ms. Acevedo directed Plaintiff to come into the office to fix the problem herself. (*Id.*) Plaintiff, who lived 90 minutes from the office, asked a co-worker who lived much closer to assist Plaintiff, and she agreed to do so. (P-SSOF ¶¶ 27–28; Resp. to P-SSOF ¶¶ 27–28.) Although Ms. Acevedo agreed that Plaintiff's request was a "good idea," she verbally counseled Plaintiff for not following her instructions and interfering with her co-worker's day off without first clearing it with Ms. Acevedo. (P-SSOF ¶¶ 29–30; Resp. to P-SSOF ¶¶ 29–30; ECF No. 41-4 at 36.) Ms. Acevedo told Ms. Moran about this incident, and Ms. Moran agreed with her decision to reprimand Plaintiff. (P-SSOF ¶ 32; Resp. to P-SSOF ¶ 32.)

A week later, on April 6, Ms. Acevedo "counseled" Plaintiff for "[l]oud and disruptive" behavior in the office after a nurse reported to Ms. Acevedo regarding an argument Plaintiff had with a home health aide over the phone regarding a scheduling issue. (P-SSOF ¶ 33; Resp. to P-SSOF ¶ 33; ECF No. 41-4 at 26, 36.) Plaintiff agreed that her tone of voice was loud during the discussion. (Pl. Dep. 218:12–19; *see also* ECF No. 41-4 at 26 ("Donna states she was upset and she was loud. Apologized for her behavior.").)

---

[6] In her deposition, Ms. Moran agrees that the conversation occurred, but disputes that she commented about Plaintiff's son. (Moran Dep. 46:22–50:7.)

Next, on July 10, 2020, Ms. Acevedo reprimanded Plaintiff for her behavior on a call with a patient's family member. (P-SSOF ¶¶ 35–36; Resp. to P-SSOF ¶¶ 35–36.) Plaintiff testified that after receiving a complaint about an AHS employee's conduct from a patient's family member, she "pleaded" with the family member for the employee's name. (P-SSOF ¶ 36; Resp. to P-SSOF ¶ 36.) Although Plaintiff testified that "all she was trying to do was get the person's name" to pass it on to her supervisor, Ms. Acevedo intervened, testifying that Plaintiff should have simply "take[n] the complaint, see if she could correct the problem, and if she couldn't, she should have given me the complaint directly." (P-SSOF ¶¶ 37–38; Resp. to P-SSOF ¶¶ 37–38.)

Finally, on August 20, 2020, Ms. Acevedo gave Plaintiff a verbal warning after Plaintiff used the word "stunad"—apparently, Italian American slang for "stupid"—in reaction to an incident where another co-worker "gave [Plaintiff] the middle finger in the office."[7] (P-SSOF ¶¶ 42–44; Resp. to P-SSOF ¶¶ 42–44.) While Plaintiff received a "verbal warning" for the incident, the other employee received the "lesser punishment" of a counseling. (P-SSOF ¶ 44; Resp. to P-SSOF ¶ 44.)

### 2.      August and December 2020 Incidents

Plaintiff's ultimate dismissal and Defendants' motivations for doing so center on a series of incidents involving Plaintiff and patient family members, as well as co-workers. In August 2020, Plaintiff had a telephone conversation with a patient's spouse, TR, about scheduling future home health aide visits for his wife undergoing chemotherapy treatments. (D-SOF ¶¶ 4, 18; Resp. to D-SOF ¶¶ 4, 18.) During the call with Plaintiff, TR asked if AHS needed "more nurses" after being told that no aides were available for scheduling. (D-SOF ¶ 4; Resp. to D-SOF ¶ 4.) While Plaintiff

---

[7] Plaintiff also asserted that she was targeted by Ms. Acevedo for her use of the Italian American word "skeevatz," meaning "mess." (D-SOF ¶¶ 54–55; Resp. to D-SOF ¶¶ 54–55; Pl. Dep. 166:8–167:8.) However, Plaintiff was not disciplined for this incident. (D-SOF ¶ 55; Resp. to D-SOF ¶ 55.)

apparently believed that she had hung up the phone, TR was still on the line when he overheard

Plaintiff use profanity while mocking him in a conversation with Plaintiff's co-worker, Stacy

Holdorf:

> T.R.: Apparently, you need more nurses then, right?
>
> DONNA JUSSEN: Yes, we definitely do. Believe me. Believe me, we do, yes.
>
> T.R.: Okay.
>
> DONNA JUSSEN: All right?
>
> T.R.: All right.
>
> DONNA JUSSEN: All right. Thank you very much. All right.
>
> T.R.: Bye-bye.
>
> DONNA JUSSEN: Take care. Bye-bye. We need more aides, he told me. Yeah, really? Well, good for you, bravo. Bravo, sir, bravo.
>
> T.R.: You're still on the line, bravo. You're still on the line, bravo.
>
> DONNA JUSSEN: We need more aides; I can't believe he said that to me. You need more aides, lady. Really? No shit, Sherlock.[8]

(ECF No. 37-1 at 55–56; D-SOF ¶¶ 5–6; P-SSOF ¶¶ 53–54.) TR immediately called back and

expressed his frustration with Plaintiff's comments:

> DONNA JUSSEN: Good afternoon, Atlantic Visiting Nurse, this is Donna, may I help you?
>
> T.R.: Hi Donna [REDACTED].
>
> DONNA JUSSEN: Hey.
>
> T.R.: I was being compassionate with you.
>
> DONNA JUSSEN: Mm hmm.

---

[8] Although Plaintiff asserts that she was repeating a comment from Stacy Holdorf when she said "No shit, Sherlock," (P-SSOF ¶¶ 54, 56), she does not contest that the incident occurred as transcribed above, (P-SSOF ¶¶ 53–54; Resp. to D-SOF ¶¶ 11, 17 (admitting that the audio transcripts of both calls "are the conversations [Plaintiff] received a written warning for in connection with the incident with TR")).

T.R.: By saying you needed more aides, so I really didn't appreciate the comment, no shit Sherlock.

DONNA JUSSEN: Well, no, but that has nothing to do with you, that's something else that came through, actually.

T.R.: No, it was not. I was still on the line, and you said nasty things to the other lady and back at me.

DONNA JUSSEN: No, we were –

T.R.: (indiscernible)

DONNA JUSSEN: I was talking to another aide, sir.

T.R.: It's really not appropriate.

DONNA JUSSEN: I was talking to another aide that was here.

T.R.: You were not.

DONNA JUSSEN: Yeah, actually – I absolutely was.

T.R.: (indiscernible)

DONNA JUSSEN: No, because everyone is saying it.

T.R.: You said two – you said two nasty things about me, that wasn't nice and I don't appreciate –

DONNA JUSSEN: No, I really didn't. Okay.

T.R.: Goodbye.

DONNA JUSSEN: Goodbye.

(ECF No. 37-1 at 102–03; D-SOF ¶¶ 7–8; P-SSOF ¶ 54.) Plaintiff reported the incident to Ms. Acevedo, who required her to memorialize the incident in a company complaint form, which she did. (D-SOF ¶¶ 9, 12; Resp. to D-SOF ¶¶ 9, 12; ECF No. 37-1 at 106.) Ms. Acevedo likewise memorialized the incident and her "follow-up" with Plaintiff in the same complaint form, signed by Plaintiff on August 20, 2020, indicating that Ms. Acevedo met with Plaintiff and her co-worker to discuss AHS's corporate values and "[i]nstruct[] both [Plaintiff and Ms. Holdorf] to follow

8

professional language during work hours."[9] (ECF No. 37-1 at 107; D-SOF ¶ 13; Resp. to D-SOF ¶ 13.) Ms. Acevedo also issued Plaintiff a written warning (while her co-worker was verbally counseled, as explained later), which Plaintiff electronically signed on August 27, 2020, finding that Plaintiff had displayed "[p]oor customer service" and "unprofessional behavior over the phone using foul language." (ECF No. 37-2 at 2; D-SOF ¶ 15; P-SSOF ¶ 56.) The written warning also advised Plaintiff that "any repetition or similar occurrences of the above noted behavior and/or job performance will be sufficient grounds for further disciplinary action, up to and including termination."[10] (ECF No. 37-2 at 2; D-SOF ¶ 16; Resp. to D-SOF ¶ 16.)

In December 2020, Plaintiff was again reprimanded, this time for scheduling home health aides "without first having care plans by nurses in place." (P-SSOF ¶ 62; D-SOF ¶ 22.) This internal complaint was initiated by AHS weekend staff and a home health aide, who arrived to treat a patient without required nurse guidance. (Pl. Dep. 432:19–435:20; ECF No. 37-2 at 66.) Regarding this incident, in an email on December 20, Ms. Acevedo wrote Plaintiff that the lack of a plan "put[] stress on the [home health aide] and weekend staff" and that one of the patients "refused the visit expecting a shower by the [home health aide]." (ECF No. 37-2 at 66.) The following day, Ms. Acevedo admonished Plaintiff for her failure to provide a care plan. (P-SSOF

---

[9] Although not discussed in Ms. Acevedo's contemporaneous complaint form, Ms. Moran testified, and Plaintiff does not dispute, that Plaintiff's conduct did not meet AHS's "standards for patient engagement and satisfaction" because of Plaintiff's pushback and lack of assistance in helping TR schedule a nurse for his wife undergoing chemotherapy treatment. (D-SOF ¶ 18; Resp. to D-SOF ¶ 18.) TR raised this lack of an available nurse as his "only concern" in a follow-up call with Ms. Acevedo after the incident. (D-SOF ¶ 13; Resp. to D-SOF ¶ 13.)

[10] Plaintiff does not dispute that she received and signed a written warning containing the quoted language, but does assert that this was not a "final" warning under the AHS disciplinary policy, as Ms. Acevedo did not check the "final" counseling box on the form. (P-SSOF ¶ 57; ECF No. 37-2 at 2.) This dispute is not material nor genuine: Defendants do not assert in their Statement of Facts that the box was checked or that this was a final counseling. Furthermore, for the reasons stated below and given the uncontested language in the written warning that further disciplinary action could include termination, any "dispute" on this is also immaterial. (ECF No. 37-2 at 2; D-SOF ¶ 16; Resp. to D-SOF ¶ 16.)

¶ 62; ECF No. 37-2 at 62.) Plaintiff understood that there needed to be a care plan in place prior to scheduling a home health aide visit.[11] (Pl. Dep. 435:1–5.)

That same week, a patient's mother, NH, raised two complaints involving Plaintiff. First, on December 23, NH called to complain that Plaintiff had changed the time a home health aide was supposed to arrive to take care of her "bed bound" and "paraplegic" daughter without discussing it with NH first. (D-SOF ¶¶ 19, 25; Resp. to D-SOF ¶¶ 19, 25; Pl. Dep. 305:1–20.) Plaintiff had also failed to notify internal AHS parties of the change, including the nurse scheduled to take care of the patient the same day. (D-SOF ¶ 30; P-SSOF ¶ 68; Resp. to P-SSOF ¶ 68.) Because the nurse did not expect the schedule change, she did not have the aide's assistance when she arrived to take care of NH's daughter. (*Id.*) In response to the complaint, Ms. Acevedo reviewed the patient's chart, listened to the phone call recording of NH making her complaint about Plaintiff to another AHS employee, and spoke with Plaintiff. (D-SOF ¶ 29; Resp. to D-SOF ¶ 29.) Plaintiff claimed that she had left NH a voicemail to indicate the change, but acknowledged that she made the scheduling change without speaking with NH directly, obtaining NH's approval, or notifying internal AHS parties.[12] (D-SOF ¶¶ 30–31; P-SSOF ¶¶ 67–69.) On December 29, 2020,

---

[11] Plaintiff does not dispute that she was required to have a care plan in place and failed to have one before scheduling a home health aide at the time in question, but asserts that she scheduled these visits in "good faith" on the assurance by other nurses that there would be plans in place, and out of sympathy for the patient. (P-SSOF ¶¶ 64–66.) Plaintiff's claimed noble intentions in scheduling the visits, for the reasons discussed below, are not relevant and do not present a genuine issue of material fact.

[12] Plaintiff does not dispute the substance of Defendants' assertions that (1) Plaintiff changed the aide's visit time without NH's approval and without first speaking with NH directly and (2) Plaintiff did not document the change with AHS. (*See* P-SSOF ¶¶ 67–69.) To the extent Plaintiff asserts that she made the change to ensure NH's daughter received care, that NH was untruthful in her complaint and "was notoriously difficult to deal with," or that any reprimand from Ms. Acevedo was further discrimination related to her son's death, these disputes are neither genuine nor material for the reasons explained below. (*Id.* ¶¶ 69–77.) Plaintiff's assertion that the patient's father called back to confirm the change also does not present a genuine dispute. (*Id.* ¶¶ 67–68.) Plaintiff testified that she believed the patient's father had called back and confirmed the change because her co-worker, Ayesha Shaheed, had said she spoke with him. (Pl. Dep. 310:2–311:12; *see id.* 310:5–7 ("Q: And did the patient's father call you back? A: I wasn't there. The

six days later, NH contacted Ms. Acevedo again, this time to complain that Plaintiff had permanently switched her daughter's home health aide assigned to her daughter without an explanation. (D-SOF ¶ 33; Resp. to D-SOF ¶ 33.) Per the complaint form memorializing the incident, NH also asserted that the newly assigned health aide was allergic to cats, despite the cats on her property. (*Id.*; ECF No. 37-2 at 78.) Ms. Acevedo's form likewise memorialized her investigation into the switch, confirming that Plaintiff had permanently changed the aide without giving NH a reason why. (D-SOF ¶ 34; Resp. to D-SOF ¶ 34; ECF No. 37-2 at 78.) Ms. Acevedo met with Plaintiff and discussed NH's complaints. (D-SOF ¶ 36; Resp. to D-SOF ¶ 36.)

### 3.    Plaintiff's FMLA Leave and Termination

On December 28, 2020, just before receiving the second of NH's complaints, Ms. Acevedo prepared a disciplinary action form recommending Plaintiff's termination. (ECF No. 37-2 at 61–62 (recommending "[e]nd of employment"); D-SOF ¶ 39; Resp. to D-SOF ¶ 39.) Ms. Acevedo testified that she recommended Plaintiff's termination following the December 21 scheduling of an aide without a care plan and December 23 complaint from NH as well as Plaintiff's history of patient complaints, disciplinary actions, and declining performance.[13] (D-SOF ¶¶ 41–42; Resp. to D-SOF ¶¶ 41–42.) NH's subsequent complaint on December 29 occurred the day after the December 28 termination report was prepared and thus was not included therein. (*See* ECF No.

---

patient's father spoke to Ayesha. I wasn't there.").) Ms. Shaheed's own testimony, however, was that she only spoke with Plaintiff and NH about the scheduling change. (Shaheed Dep. Vol. II 46:1–20.) Either way, Plaintiff again does not dispute that none of the above was documented. (*E.g.*, Pl. Dep. 308:7–10, 309:1–2, 310:12–21.)

[13] Ms. Acevedo's termination report lists a number of other incidents not discussed by either party. (*See* ECF No. 37-2 at 61–62 (listing six counselings in April, August, and October 2020 related to scheduling or payroll issues caused by Plaintiff not raised in either Statement of Facts).) Plaintiff does reference one of these disputes in her SSOF as "Ms. Moran counsel[ing] both [Plaintiff] and [her coworker] in connection with a dispute they had in the office about where to place their jackets." (P-SSOF ¶ 61; Resp. to P-SSOF ¶ 61.)

11

37-2 at 62.) Ms. Acevedo testified that she met with Ms. Moran and discussed the report with her on December 28, and both testified that they jointly agreed to terminate Plaintiff's employment. (Acevedo Dep. 139:3–140:3; Moran Dep. 18:9–19:9.)

On December 30, after Plaintiff and Ms. Acevedo had a discussion about the December 29 complaint from NH—but not about the decision to terminate—Plaintiff requested a medical leave of absence. (D-SOF ¶ 60; P-SSOF ¶ 80; Pl. Dep. 337:7–25; ECF No. 37-2 at 119–20.) Immediately on the heels of this discussion, AHS granted Plaintiff's request and Plaintiff began her medical leave, originally slated to last one month. (D-SOF ¶¶ 62, 64; Resp. to D-SOF ¶ 62; P-SSOF ¶¶ 81–82, 90; Resp. to P-SSOF ¶ 90; ECF No. 37-2 at 122; ECF No. 41-4 at 34; Pl. Dep. 326:6–13.) On February 5, Dr. Eric Hansen recommended Plaintiff's leave extend another month, through March 5, 2021, which apparently was authorized. (P-SSOF ¶ 84; Resp. to P-SSOF ¶ 84; ECF No. 37-2 at 126.) Plaintiff testified that during her two months of leave, no one from AHS interfered with or discussed her leave of absence with her. (D-SOF ¶¶ 67–68; Resp. to D-SOF ¶¶ 67–68.) On March 3, Dr. Hansen indicated that Plaintiff was cleared to return to work on Monday, March 8 "with intermittent leave as necessary." (P-SSOF ¶ 85; Resp. to P-SSOF ¶ 85; ECF No. 37-2 at 124.)

While Plaintiff was on leave, Defendants finalized Plaintiff's termination. Although Ms. Acevedo and Ms. Moran had agreed to Plaintiff's termination on December 28, AHS policy required them to consult with HR before they informed Plaintiff. (P-SSOF ¶ 89; Resp. to P-SSOF ¶ 89; ECF No. 37-2 at 116.) Plaintiff's termination was reviewed and approved by AHS's Human Resources on January 6, 2021, with the termination considered "effective" on January 23. (P-SSOF ¶ 90; Resp. to P-SSOF ¶ 90.) On March 4, shortly before Plaintiff was set to return to work, Ms. Moran confirmed with AHS Human Resources personnel that they could "move forward" with Plaintiff's termination when she returned on March 8. (ECF No. 41-4 at 41.) Because the

termination was due to "multiple episodes of poor customer service and negative behavior," per Ms. Moran, and not related to Plaintiff's medical leave, HR approved the termination using Ms. Acevedo's original December 28, 2020 termination report. (*Id.* at 39–40.)

On March 8, Plaintiff was terminated upon her return from medical leave. (P-SSOF ¶ 93; Resp. to P-SSOF ¶ 93.) At Plaintiff's termination meeting, Ms. Acevedo and Ms. Moran explained to Plaintiff that she was being terminated based on her "behavior" and two patient complaints in December 2020.[14] (D-SOF ¶ 38; Resp. to D-SOF ¶ 38; Pl. Dep. 474:19–475:22.) Later that day, Plaintiff met with Nicole Hull, AHS's Senior Human Resources Business Partner, to whom Plaintiff raised her concerns about recent interactions with Ms. Acevedo, including Ms. Acevedo's general comments. (ECF No. 41-4 at 48–50.) Plaintiff appealed her termination that same day, which Ms. Moran reviewed and rejected on March 16. (P-SSOF ¶ 100; Resp. to P-SSOF ¶ 100; ECF No. 41-4 at 64.)

### B.    PROCEDURAL BACKGROUND

On September 23, 2021, Plaintiff filed suit against Defendants in the Superior Court of New Jersey, Law Division, in Ocean County. (ECF No. 1 at 12.)[15] Plaintiff asserted three claims: (1) a claim under the New Jersey Law Against Discrimination ("NJLAD") for discrimination based on a disability against Defendant AHS, (Complaint ¶¶ 18–24 (citing N.J. Stat. Ann. § 10:5-12(a))); (2) a claim under the NJLAD for aiding and abetting discrimination against Defendants Acevedo

---

[14] Although Plaintiff does not dispute that she testified that Defendants justified her termination based on two patient complaints on "December 21 and December 27," (Resp. to D-SOF ¶ 38; Pl. Dep. 474:19–475:1), Plaintiff expounds by acknowledging that Ms. Acevedo and Ms. Moran told her the decision was based on an incident "involving a phone call with a patient's husband [which appears to relate to the August 2020 incident with TR] and the other involving the mother of another patient [which appears to relate to the December 23, 2020 incident with NH]," (P-SSOF ¶ 94).

[15] To avoid confusion with the page numbering from Plaintiff's state court complaint and Defendants' removal notice, the Court cites to Plaintiff's Complaint, filed at pages 5–13 of ECF No. 1, by paragraph number.

and Moran, (*id.* ¶¶ 25–27 (citing N.J. Stat. Ann. § 10:5-12(e))); and (3) claims under the FMLA against AHS, (*id.* ¶¶ 28–33 (citing 29 U.S.C. §§ 2615(a)(1)–(2))). Defendants timely removed the action to this Court pursuant to 28 U.S.C. § 1331 on December 21, 2021. (*Id.* at 2.) On January 18, 2022, Defendants answered. (ECF No. 6.) This case then proceeded through discovery for more than three years before Defendants filed the instant Motion in October 2025. (MSJ.) Consistent with the Court's briefing schedule and its various extensions to the parties, the instant Motion is now ripe for decision. (ECF Nos. 33, 35, 39, 43.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Put another way, "[s]ummary judgment is designed . . . to assess whether a genuine issue of material fact exists and whether a trial is necessary." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding the existence of a genuine dispute of material fact, the Court views all facts and reasonable inferences in the light most favorable to the nonmovant and asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Fowler v. AT&T Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (quoting *Anderson*, 477 U.S. at 251–52).

If the party seeking summary judgment carries its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere

14

existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Turco v. City of Englewood*, 935 F.3d 155, 161 (3d Cir. 2019) (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)). "Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018); *see Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). Likewise, the movant may establish entitlement to judgment as a matter of law by showing that the plaintiff's evidence is insufficient to establish an essential element of his claim. This showing "necessarily renders all other facts immaterial," such that "there can be no genuine issue as to any material fact" for a jury to decide. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

## III.   DISCUSSION

### A.   NJLAD CLAIMS

Plaintiff's first claim at issue is a discriminatory termination claim under the NJLAD against Defendant AHS.[16] (*See* Complaint ¶¶ 18–24); N.J. Stat. Ann. § 10:5-12(a). Such claims

---

[16] Plaintiff's Complaint does not specify what kind of NJLAD claim she brings against AHS, instead pleading a generalized allegation that AHS discriminated against her "in compensation or in terms, conditions or privileges of employment based on her disability/perceived disability. . . includ[ing], but not limited to, subjecting Ms. Jussen to harassment and a hostile work environment based on her disability that culminated in her termination, retaliating against her for having taken a leave of absence, and termination of her employment." (Complaint ¶ 22.) However, in her opposition to Defendants' Motion, Plaintiff only discusses her NJLAD claim as a discriminatory *termination* claim and makes no mention whatsoever to a hostile work environment, retaliatory termination (at least in the NJLAD context), or any other NJLAD claim. (Opp. at 6–17.) Defendants do the same. (*See* MSJ at 9–22.) Because Plaintiff makes no mention of any other NJLAD claims at summary judgment, let alone any argument suggesting her intention to preserve any such claims, the Court considers all other NJLAD claims included in the Complaint's generalized Count I forfeited. *See Castillo v. Viso*, No. 17-5255, 2024 WL 3594351, at *5 n.10 (D.N.J. July 31, 2024) (collecting cases); *cf. United States v. Morton*, 993 F.3d 198, 204 n.10 (3d Cir. 2021) ("Judges are not like pigs, hunting for truffles buried in the record.").

15

are analyzed under the framework outlined by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferren v. Foulke Mgmt Corp.*, No. 15-3721, 2017 WL 634511, at \*4 (D.N.J. Feb. 16, 2017). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discriminatory discharge, showing (1) that she had a disability within the meaning of the NJLAD, (2) that she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation, (3) that she suffered an adverse employment action, and (4) that the employer sought someone else to perform the same work. *Id.* (citing *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016)). After plaintiff has done so, the burden shifts to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the employer can do so, the burden finally shifts back to the plaintiff, who must "show that the employer's proffered reason was merely a pretext for discrimination." *Id.*

### 1.   Legitimate, Non-Discriminatory Reasons for Termination

Defendants concede in their Motion that Plaintiff has met "the low bar of a *prima facie* case for perceived disability" under the NJLAD including that Plaintiff "suffered . . . an emotional or perceived mental disability" related to her son's death and was terminated from her position at AHS. (MSJ at 10; *see* P-SSOF ¶¶ 79–86 (describing Plaintiff's "severe depression and anxiety" diagnosis and treatment).) Given Defendants' apparent broad, generalized stipulation, the Court assumes *arguendo* that Plaintiff has established a prima facie case of discriminatory discharge under the NJLAD and will proceed accordingly. However, the Court notes that neither party cited to (and the Court's own cursory review could not find) any evidence supporting the fourth prong: that AHS sought someone else to perform Plaintiff's job after terminating her. *See Ferren*, 2017 WL 634511, at \*4; *see also Pailleret v. Jersey Constr., Inc.*, No. 09-1325, 2011 WL 1485402, at

*10 (D.N.J. Apr. 19, 2011) (granting summary judgment where plaintiff failed to establish that defendant replaced or sought to replace him); *O'Brien v. Int'l Bus. Machs., Inc.*, No. 06-4864, 2009 WL 806541, at *18 (D.N.J. Mar. 27, 2009) (same).

The burden thus shifts to AHS "to prove a legitimate, non-discriminatory reason for the employment action." *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1237 (N.J. 2005). The Court is satisfied that AHS has met its burden. In support of AHS's decision to terminate Plaintiff, Defendants—consistent with their original stated bases for dismissal—first point to the August 2020 incident involving Plaintiff and TR, a patient's spouse. (MSJ at 10–12; *see* ECF No. 37-2 at 61–62.) During the recorded conversation, TR—whose wife was actively undergoing chemotherapy treatment—overheard Plaintiff mocking TR about his simple inquiry as to whether AHS needed more nurses. (D-SOF ¶¶ 4, 18; Resp. to D-SOF ¶¶ 4, 18.) Per the transcript of the call, Plaintiff repeatedly stated "bravo" after TR's inquiry, and used profanity when she made the sarcastic remark "[n]o shit, Sherlock," which apparently offended him, with Plaintiff unaware that TR remained on the line and overheard it all. (ECF No. 37-1 at 55–56; D-SOF ¶¶ 5–6; P-SSOF ¶¶ 53–54.) TR promptly called back to express his offense, and on the uncontested transcript record, Plaintiff appeared rather dismissive of him and denied accountability for the incident. (ECF No. 37-1 at 102–03; D-SOF ¶¶ 7–8; P-SSOF ¶ 54.) After the incident, Plaintiff herself acknowledged her misconduct by signing Ms. Acevedo's written warning, which specifically advised Plaintiff that "any repetition or similar occurrences of the above noted behavior and/or job performance will be sufficient grounds for further disciplinary action, up to and including termination." (ECF No. 37-2 at 2; D-SOF ¶¶ 15–16; Resp. to D-SOF ¶ 16; P-SSOF ¶ 56.)

Second, Defendants cite the December 2020 incidents involving complaints from a patient's mother, NH, as additional reasons for Plaintiff's termination.[17] (MSJ at 12–14.) As discussed previously, Plaintiff—without speaking to NH or documenting the change internally—changed the time of a home health aide appointment, leading to confusion and service issues with an AHS nurse. (D-SOF ¶¶ 25, 30–31; Resp. to D-SOF ¶ 25; P-SSOF ¶¶ 67–69.) Six days later, NH called Ms. Acevedo to complain again, this time because Plaintiff, without offering NH an explanation, had permanently switched her daughter's home health aide to an aide who was allergic to cats despite the cats at the patient's home. (D-SOF ¶¶ 33–34; Resp. to D-SOF ¶¶ 33–34; ECF No. 37-2 at 78.)

Finally, Defendants cite to other disciplinary and performance issues occurring between the August 2020 and December 2020 incidents.[18] (MSJ at 14–15, 15 n.2.) In October 2020, Plaintiff had an argument with her co-worker, Stacy Holdorf, that required Ms. Moran's intervention. (P-SSOF ¶ 61; Resp. to P-SSOF ¶ 61.) Plaintiff testified that she had, in her own words, started this "infantile and childish" dispute with Ms. Holdorf over where Ms. Holdorf had placed her jacket in the office, with Plaintiff agreeing that she was "being loud" and that Ms. Moran's decision to reprimand Plaintiff was "absolutely right." (Pl. Dep. 428:14–430:4.) Additionally, as discussed previously on page 9, shortly before NH's first complaint in December 2020, Plaintiff scheduled a home health aide without having the required "care plan" in place,

---

[17] Although Ms. Acevedo report's recommending Plaintiff's termination was prepared the day before NH lodged her second complaint against Plaintiff, Ms. Moran and Ms. Acevedo appear to have discussed this later complaint with Plaintiff at her termination meeting the following March as an additional basis for termination. (D-SOF ¶ 38; Resp. to D-SOF ¶ 38; Pl. Dep. 474:19–475:22.)

[18] As discussed previously, the October 14, 2020 incident in Ms. Acevedo's report related to a "change of schedule" issue not discussed by either party. *See supra* note 13.

18

causing "stress on the [home health aide] and weekend staff" and affecting the services at a patient visit. (ECF No. 37-2 at 66; *see* P-SSOF ¶ 62; D-SOF ¶ 22; ECF No. 37-2 at 62; Pl. Dep. 435:1–5.)

Plaintiff's repeated conduct, spanning a number of months and bespeaking poor workplace demeanor and professional deficiencies, including incidents affecting patients' care and involving family members, did not meet AHS's standards for patient engagement and satisfaction, (D-SOF ¶ 18; Resp. to D-SOF ¶ 18), violated a number of AHS's human resources policies and corporate values, which Plaintiff was aware of or had access to, (D-SOF ¶¶ 48–50; Resp. to D-SOF ¶¶ 48–50). The Court concludes that Defendants have met their burden to articulate legitimate, non-discriminatory reasons for Plaintiff's termination.

### 2. Pretext

The burden thus shifts back to Plaintiff to demonstrate pretext. At the summary judgment stage, this burden requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tourtellotte*, 636 F. App'x at 842 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)); *see also Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) (explaining that plaintiff's final burden requires proving that "the protected status of the plaintiff was the *determinative factor* of the adverse employment action" (emphasis added)). "Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 955 (N.J. 1999).

Plaintiff—whose opposition brief fails to cite to her Supplemental Statement of Facts or the record—attempts to discredit each of Defendants' non-discriminatory reasons for termination by discussing various "salient" facts she believes Defendants have omitted. (Opp. at 9–17.) *But see* Fed. R. Civ. P. 56(c)(1) (requiring citations in support of parties' assertions in summary judgment briefing).[19] These attempts all fail to create a triable issue of fact for the same reasons: Plaintiff does not dispute the facts underlying each incident leading to her termination, and she presents no evidence of discriminatory animus. Her arguments thus amount to mere suspicions, bare assertions, and speculation alongside minor quibbles over immaterial details, none of which defeats summary judgment here. *See Jackson*, 594 F.3d at 228; *Jutrowski*, 904 F.3d at 288–89.

First, with respect to the August 2020 telephone incident and written warning, Plaintiff asserts that: (1) she "immediately self-reported" the incident to Ms. Acevedo and apologized to the patient's husband; (2) the patient's husband had no additional concerns about Plaintiff; (3) Ms. Acevedo punished Plaintiff with a written warning, but only "counseled" her co-worker; and (4) Ms. Acevedo "misrepresented" that the written warning was a final warning.[20] (Opp. at 9–10.)

---

[19] The requirement in Local Civil Rule 56.1 that parties furnish statements of material fact as separate documents accompanying their summary judgment briefing certainly does not relieve parties of their obligation to marshal those facts—with citations to the record or at the very least to the relevant paragraphs of their statement of material facts—in support of their arguments. That would fly in the face of the spirit of Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56: The parties must point to their proofs and identify genuine disputes of material fact for the Court, not leave the Court to hunt for those disputes itself. *Cf. Owens v. Am. Hardware Mut. Ins. Co.*, No. 11-6663, 2012 WL 6761818, at *3 (D.N.J. Dec. 31 2012) ("Without compliance with [Local Civil Rule 56.1], the Court is left to sift through often voluminous submissions in search of--sometimes in vain--the undisputed material facts."); *Schecter v. Schecter*, No. 07-419, 2008 WL 5054343, at *7 (D.N.J. Nov. 26, 2008) (describing "the principle embodied by [Local Civil Rule 56.1]—that the parties narrow the key issues so the Court can adjudicate the motion without embarking on a judicial scavenger hunt for relevant facts"); *cf. also* L. Civ. R. 56.1(a) (providing that non-movant's responsive statement of material facts "shall not contain legal argument or conclusions of law" and accordingly suggesting that legal arguments made in accompanying briefs must incorporate relevant paragraphs or citations in statement of facts).

[20] While Defendants do raise, in their Response to Plaintiff's Supplemental Statement of Facts, that Ms. Acevedo made an "error" in not checking the "final" counseling box, (Resp. to P-SSOF ¶ 57 (citing

Plaintiff's rebuttal fails to undermine Defendants' reliance on this incident as a basis for its decision to terminate Plaintiff. Plaintiff does not dispute that the call with TR happened exactly as reflected in the in verbatim transcript, that her conduct violated AHS's written policies, and that she signed the written warning indicating and acknowledging that she could be fired for future problems with her behavior or job performance. (ECF No. 37-1 at 55–56, 102–03; ECF No. 37-2 at 2; D-SOF ¶¶ 5—8, 15–16; Resp. to D-SOF ¶ 16; P-SSOF ¶¶ 53–54, 56.) Although Plaintiff notes that Ms. Acevedo did not check the "final counseling" box on the written complaint, Plaintiff does not and cannot dispute that express AHS policy allows for termination for an at-will employee without notice and without a final warning—indeed, regardless of any interim or escalating disciplinary action—"if the behavior warrants it immediately," which, as discussed below, her continued problematic behavior in December 2020 did.[21] (D-SOF ¶ 48; Resp. to D-SOF ¶ 48.) Plaintiff's facts about self-reporting the incident and improving her relationship with TR after the fact are beside the point and provide no basis to reasonably disbelieve Defendants' proffered non-discriminatory reason for termination, let alone suggest that AHS's decision included any "purposeful or intentional discrimination." *Bergen Com. Bank*, 723 A.2d at 955. Furthermore, Ms. Acevedo's decision to punish Plaintiff more harshly than her co-worker—who did not speak or interact with TR at any point during the incident and who, frankly, had nothing to do with the matter until Plaintiff brought her into it by offhandedly making comments to her—was not only reasonable given Plaintiff's uncontested comment and subsequent dismissiveness of TR after he called back to express the impropriety of Plaintiff's conduct, but also provides no basis to "believe

---

Acevedo Dep. Vol. II 64:2–6)), Defendants do not argue anywhere in their briefing or Statement of Facts that the written warning constituted a final warning, (*see, e.g.*, Reply at 4).

[21] Plaintiff also does not dispute that the tiered counseling process did not modify her at-will status or that AHS could terminate Plaintiff at any time. (D-SOF ¶ 48; Resp. to D-SOF ¶ 48.)

that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tourtellote*, 636 F. App'x at 842. In short, Plaintiff fails to indicate any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action," and she presents no evidence from which a reasonable juror could find that discriminatory animus more likely than not motivated her termination. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

As to the December 2020 complaints from the patient's mother, NH, Plaintiff asserts that Plaintiff called and left a message with NH discussing the change, i.e., that NH was not being truthful about Plaintiff's level of communication about the incident,[22] and that Plaintiff's actions had helped "successfully schedule[] a competent aide willing to make a home visit" despite NH being "notoriously difficult." (Opp. at 10–11.) Again, Plaintiff's rebuttal fails to cast doubt on Defendants' articulated basis supporting its decision to terminate. Plaintiff does not contest that she failed to discuss the scheduling changes she unilaterally made with NH directly, or, crucially, with internal AHS parties, leading to confusion for the AHS nurse who arrived without the expected assistance of a home health aide hours later. (D-SOF ¶¶ 25, 30–31; Resp. to D-SOF ¶ 25; P-SSOF ¶¶ 67–69.) Plaintiff also does not dispute that, less than a week following this incident, she permanently changed NH's home health aide, without advising NH, to an aide allergic to cats. (D-SOF ¶¶ 33–34; Resp. to D-SOF ¶¶ 33–34; ECF No. 37-2 at 78.) Plaintiff's assertions about NH's truthfulness and difficulty in no way undermine the uncontested facts that Plaintiff's conduct

---

[22] As discussed above, *see supra* note 12, Plaintiff contends that her co-worker Ayesha Shaheed confirmed NH's untruthfulness. (Opp. at 10.) Ms. Shaheed's cited deposition testimony contains no such confirmation, nor did Ms. Shaheed assert that NH was untruthful about the incident at any other point during her two depositions. (Shaheed Dep. Vol. I 59:16–60:3; *see* Shaheed Dep. Vol. II 42:2–46:20.) At best, Ms. Shaheed testified it was "untrue" that Plaintiff "never" communicated schedule changes. (Shaheed Dep. Vol. I 59:18–21.)

created client and personnel issues for AHS and its staff and violated company policy. (D-SOF ¶ 48; Resp. to D-SOF ¶ 48.) To the extent Plaintiff contends her conduct was justified by the circumstances, she cannot meet her burden at this stage by simply showing that AHS's decision was "wrong or mistaken," rather, she must show that "a reasonable factfinder could rationally find [AHS's stated reasons] unworthy of credence." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). Because Plaintiff's motivations—whether well-intentioned or not—do not indicate that AHS's stated reasoning was pretextual, Plaintiff has not met this burden.

Finally, Plaintiff also responds to some of the remaining disciplinary and behavioral bases raised by Defendants.[23] With respect to the December 2020 "scheduling issues" regarding the lack of a care plan, Plaintiff does not deny her failure to ensure that it was in place as required by AHS policy, but instead avers that she scheduled the aide visits in "good faith" to ensure that the patient received weekend care. (Opp. at 12.) Furthermore, Plaintiff argues that three other disciplinary incidents—on March 31 (Plaintiff asking a co-worker to go into the office for her), April 6 (Plaintiff having a disruptive, loud argument with a home health aide), and July 10, 2020 (Plaintiff "pleading" with a patient's family member for the name of an AHS employee)—each revealed "how Ms. Acevedo targeted Ms. Jussen when she returned to work after her son's passing." (*Id.* at 15.) In support, Plaintiff cites her co-worker Ayesha Shaheed's deposition testimony that Ms. Acevedo was "nitpicking" Plaintiff as evidence of this dynamic. (*Id.* at 16.)

Plaintiff's averments of supposedly unfair reprimands do not indicate that Defendants' justifications are pretextual. As an initial matter, each of Plaintiff's examples of "targeted" disciplinary events do not cast doubt on the uncontested facts of the August and December

---

[23] Plaintiff concedes that the October 2020 incident involving her co-worker occurred and that she was "verbally counselled" by Ms. Moran "in connection with [the] dispute." (P-SSOF ¶ 61.)

23

incidents, which Defendants have consistently asserted were bases for Plaintiff's dismissal. (*Id.* at 15.) Even assuming, *arguendo*, that these other events indicate supposed "targeting,"[24] they do not undermine Defendants' neutral, non-discriminatory bases for dismissal. *See Coleman v. Delaneys' Cape May, LLC*, No. 17-2581, 2019 WL 6873758, at *8 (D.N.J. Dec. 17, 2019) (holding that Plaintiff failed to make out prima facie case of discrimination because highlighted instances of racial discrimination at other times during employment did not suggest that discrimination "played any part" in termination). As for Plaintiff's scheduling errors in December 2020, Plaintiff's self-serving claim of "good faith" when she failed to properly ensure a care plan prior to scheduling does not dispute that those errors occurred as described, or that such errors were not grounds for termination under AHS policy. (D-SOF ¶ 48; Resp. to D-SOF ¶ 48.)

Ms. Shaheed's testimony that Ms. Acevedo was "nitpicking" Plaintiff's conduct is also insufficient to create a genuine issue of material fact. Ms. Shaheed in no way references Plaintiff's asserted basis of discrimination—the loss of her son—as the motivation for Ms. Acevedo's "nitpicking" in either of her depositions. *See supra* note 3. Moreover, Ms. Shaheed's testimony—

---

[24] The Court also finds Plaintiff's offered instances of supposed unfair reprimands by Ms. Acevedo unconvincing. As to the March 31, 2020 incident in which Plaintiff had a co-worker resolve a phone-forwarding issue after being instructed to do so herself, Plaintiff does not dispute that she did not follow Ms. Acevedo's instructions before interfering with a co-worker's day off. (P-SSOF ¶¶ 29–30; Resp. to P-SSOF ¶¶ 29–30; ECF No. 41-4 at 36.) The fact that Ms. Acevedo later testified that Plaintiff's plan may have been a "good idea" is of no import, even if the incident did factor into Defendants' decision to terminate Plaintiff—which neither party suggests. (P-SSOF ¶ 29; Resp. to P-SSOF ¶ 29); *Fuentes*, 32 F.3d at 765 ("[P]laintiff cannot simply show that employer's decision was wrong or mistaken . . . ."). As to the April 6, 2020 incident in which Plaintiff was "counseled" for being "[l]oud and disruptive" following an argument with a home health aide, the fact that Ms. Acevedo was not physically present for the argument in no way suggests that the decision to reprimand was targeted, particularly where Plaintiff acknowledges the incident occurred as described. (Pl. Dep. 218:12–19; P-SSOF ¶ 33; Resp. to P-SSOF ¶ 33; ECF No. 41-4 at 26.) Finally, as to the June 10, 2020 incident in which Ms. Acevedo stopped Plaintiff from soliciting a complaint about an AHS's employee from a patient's family member, Plaintiff's belief that she "was doing the right thing" does not indicate that Ms. Acevedo was targeting her or that the decision to terminate Plaintiff was pretext. (P-SSOF ¶¶ 35–40); *Fuentes*, 32 F.3d at 765. Regardless, neither party asserts that this June 10, 2020 incident was a basis for Plaintiff's termination.

24

which, at best, suggests a contentious relationship between Ms. Acevedo and Plaintiff, (*see* Shaheed Dep. Vol. I 60:4–63:25)—is not "evidence of inconsistencies or anomalies that could support an inference that [AHS] did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995); *see also Ali v. Woodbridge Twp. Sch. Dist.*, No. 17-2210, 2019 WL 1930754, at *7 (D.N.J. Apr. 30, 2019) ("A plaintiff bears the burden of proving pretext by a preponderance of the evidence."), *aff'd*, 957 F.3d 174. To the extent Ms. Shaheed's testimony suggests that AHS's decision to fire Plaintiff on its stated grounds was *unfair*, or was not "wise, shrewd, [or] prudent," such testimony does not support pretext, "since the factual dispute at issue is whether discriminatory animus motivated" AHS. *Keller*, 130 F.3d at 1108 (quoting *Fuentes*, 32 F.3d at 765); *see also id.* at 1109 ("[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." (second alteration in original) (citation omitted)). Here, the Plaintiff has failed to demonstrate that unlawful discrimination played any role in Defendants' decision to terminate her, and no factfinder could reasonably find Defendants' articulated bases pretextual.

In response to the suggestion that Plaintiff's broader disciplinary history and behavior also justified her termination, Plaintiff raises other instances of what she believes indicate a pattern of targeted, unfair reprimands and what she viewed as insensitive comments by Ms. Acevedo following Plaintiff's return to work in March 2020 after her son's death. (Opp. at 12–16.) Plaintiff, without providing specific details regarding the context or intent of the conversations, testified that Ms. Acevedo made "approximately 20" comments that she wanted "the old Donna back" and that Plaintiff needed to "[s]nap out of it," among other things. (*Id.* at 12–13; D-SOF ¶¶ 56–57; Resp. to D-SOF ¶¶ 56–57; Pl. Dep. 169:7–8, 185:11–24); *supra* note 4. Plaintiff's "self-serving"

25

deposition testimony about Ms. Acevedo's comments alone is insufficient to raise a genuine dispute of material fact at summary judgment. *Lynn v. Bank of N.Y. Mellon*, No. 22-4655, 2025 WL 907898, at *7 n.14 (D.N.J. Mar. 25, 2025) (citing *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011)). Even assuming, *arguendo*, that Plaintiff's vague testimony could somehow create a factual dispute, Ms. Acevedo's comments—which were allegedly made when Plaintiff returned to work in March 2020, (Opp. at 12–13)—are too temporally distant from the decision to terminate in December 2020 to undermine Defendants' offered reasons. *See Keller*, 130 F.3d at 1112 (finding a "comment [that] occurred four or five months prior to the time when [employer] decided that [Plaintiff] should be discharged" did not demonstrate animus); *Rymas v. Princeton Healthcare Sys. Holding, Inc.*, No. 15-8188, 2017 WL 4858123, at *8 (D.N.J. Oct. 27, 2017) (finding that employer conduct five months before plaintiff's termination failed to suggest termination was pretextual); *Milham v. Cortiva Educ., Inc.*, 302 F. App'x 70, 71 (3d Cir. 2008) ("[T]he comments of one manager that are this attenuated from the decision to terminate are not enough to survive summary judgment without more than appears on this record."); *Fuentes*, 32 F.3d at 767 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992))); *see also Turco*, 935 F.3d at 161 ("The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue.").

In sum, the record before the Court does not present a rush to judgment after a single incident between co-workers or a one-off exchange with a patient, but rather indicates an unmistakable series of Plaintiff's failures and deficiencies in professional comportment and

26

demeanor, affecting the treatment of patients and their families, resulting in a number of disciplinary measures, and spanning a period of months. Plaintiff used profane, mocking language on a call with a patient's husband whose wife was actively undergoing chemotherapy, and then was dismissive of him when he literally called her out on it. (D-SOF ¶¶ 5–8; P-SSOF ¶¶ 53–54 (August 2020).) Plaintiff had multiple incidents of loud, disruptive behavior in the workplace, conduct she admitted herself was "infantile and childish." (Pl. Dep. 428:14–430:4 (October 2020).) During her final full week on the job, Plaintiff made several scheduling errors—without fully discussing her changes with the relevant caregivers or patients (including the mother of a bed-ridden, paraplegic child)—that led to internal confusion, customer complaints, and lapses in patient care. (P-SSOF ¶¶ 28, 62, 67–69; D-SOF ¶¶ 22, 25, 30–31, 33–34; Resp. to D-SOF ¶¶ 25, 33–34 (December 2020).) Plaintiff's position—which facilitates and coordinates home healthcare services to patients and their families in turmoil and crisis—requires the utmost sensitivity and discretion. Thus, Plaintiff's termination resulted from a series of incidents requiring a myriad of disciplinary interventions, and was not the byproduct of a hasty decision or one motivated by discrimination. Accordingly, AHS is entitled to summary judgment on Plaintiff's discriminatory discharge NJLAD claim.[25]

---

[25] Because the Court concludes that AHS is entitled to summary judgment with respect to Plaintiff's NJLAD discriminatory discharge claim, Defendants Acevedo and Moran are likewise entitled to summary judgment for Plaintiff's NJLAD aiding and abetting claims. (*See* Complaint ¶¶ 25–27 (citing N.J. Stat. Ann. § 10:5-12(e)); *Taylor v. Lincare, Inc.*, No. 15-6284, 2016 WL 3849852, at *8 (D.N.J. July 15, 2016) ("[B]ecause Plaintiff's underlying causes of action fail, there can be no claim for aiding and abetting in violation of the NJLAD." (quoting *Haddix v. Camden Cnty. Youth Det. Ctr.*, No. 13-1594, 2015 WL 3755023, at *6 (D.N.J. June 16, 2015))); *see also Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 307 n.15 (3d Cir. 2004) (affirming summary judgment on NJLAD discrimination claims and reasoning that "any claim [plaintiff] brought against the individual defendants for aiding and abetting fails as well").

### B.    FMLA CLAIMS

Finally, Defendants seek summary judgment on Plaintiff's claim under the FMLA for retaliatory discharge.[26] 29 U.S.C. § 2615(a)(2). The FMLA's retaliation provisions prohibit employers from "discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (citation omitted). Proving such claims based on circumstantial evidence, as Plaintiff attempts to do so here, implicates the same *McDonnell Douglas* burden-shifting framework described above. *Id.* "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 301–02 (3d Cir. 2012) (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508–09 (3d Cir. 2009)). After a plaintiff has established this prima facie case, the defendant must provide evidence of a "legitimate non-discriminatory reason for the adverse action." *Budhun*, 765 F.3d at 256. "If the employer meets this 'minimal burden,' the employee must then point to some evidence that the defendant's reasons for the adverse action are pretextual." *Id.* (quoting *Lichtenstein*, 691 F.3d at 302).

As an initial matter, Plaintiff has not established a prima facie case of an FMLA retaliation claim. Although Plaintiff suffered an adverse employment decision following her invocation of her right to FMLA leave, she has not established that the "adverse action was causally related to her invocation of rights." *Lichtenstein*, 691 F.3d at 302. The Third Circuit has explained that courts

---

[26] Plaintiff concedes that she is unable to assert a claim under 29 U.S.C. § 2615(a)(1) for interference with her FMLA rights, as she testified that nobody from AHS interfered with her leave of absence in any way. (D-SOF ¶ 67; Resp. to D-SOF ¶ 67; Opp. at 21 n.3.) Accordingly, Defendants are entitled to summary judgment on this claim within Count III. (Complaint ¶¶ 28–33.)

should be "reluctant to infer a causal connection based on temporal proximity alone." *Budhun*, 765 F.3d at 258. Instead, plaintiffs can prove causation with "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). As discussed, Plaintiff offers no evidence—let alone a pattern—of antagonism related to her FMLA leave. *See supra* note 26. Plaintiff argues that because AHS HR did not finalize her termination until January 6, 2021, while she was actively on FMLA leave, and Defendants officially terminated her on March 8, 2021, the day she returned from leave, the timing is "unduly suggestive" of a causal connection. (Opp. at 21–25.) However, as Plaintiff concedes, Ms. Acevedo prepared the disciplinary action report recommending Plaintiff's termination on December 28, 2020, two days *before* Plaintiff requested FMLA leave. (D-SOF ¶ 39; Resp. to D-SOF ¶ 39.) Because Defendants' decision to terminate Plaintiff predated her request for FMLA leave, Plaintiff's request could not and did not cause her termination. *Atchison v. Sears*, 666 F. Supp. 2d 477, 490–91 (E.D. Pa. 2009) ("[C]ourts have found that a plaintiff cannot establish a [causal] link when the 'decision' to take adverse employment action occurred *before* plaintiff exercised his or her FMLA rights." (emphasis added) (collecting cases)).

Further, in a March 5, 2021 email thread including the individual Defendants and members of AHS's HR team, Ms. Moran confirmed with HR that Ms. Acevedo's same December 28 paperwork could be used in connection with Plaintiff's termination upon her return. (ECF No. 37-2 at 81.) In other words, the rationale for Plaintiff's termination was unchanged and was simply to be communicated after she returned from leave. Plaintiff's reliance on the timing of when she was officially notified that she was being terminated alone is insufficient to establish causation where

29

the decision to terminate preceded her request for FMLA leave. *See Burch v. WDAS AM/FM*, No. 00-4852, 2002 WL 1471703, at *10 (E.D. Pa. June 28, 2002) ("In the instant case, however, the evidence that the decision to terminate plaintiff was made before he requested or took leave is uncontroverted. One cannot reasonably conclude that plaintiff was terminated for something which occurred after the decision to terminate him was made.").

Moreover, although Plaintiff argues that Ms. Acevedo's report still required final HR approval before the termination decision was finalized, Plaintiff "has not directed the Court to any evidence that [Defendants] ever reconsidered [their] decision to terminate [her] after the decision was made . . . . The fact that the complete [report] was awaiting final sign-off when [Plaintiff] requested FMLA leave does not save [her] on the causation issue." *Atchison*, 666 F. Supp. 2d at 492; *cf. Zungoli v. United Parcel Serv., Inc.*, No. 07-2194, 2009 WL 1085440, at *6 (D.N.J. Apr. 22, 2009) (holding that additional evidence indicating employer was still deliberating about plaintiff's termination after FMLA leave request created dispute of material fact). There is no evidence in the record that anyone at AHS reconsidered, questioned, or altered Ms. Acevedo's pre-leave report prior to its authorship on December 28, its approval on January 6, its effective date on January 23, or Plaintiff's termination on March 8. In fact, the record suggests the opposite—that Ms. Acevedo's December 28, 2020 report and paperwork were sufficient and expressly relied upon for Plaintiff's eventual termination. (ECF No. 37-2 at 81.) Accordingly, Plaintiff has failed to establish a prima facie FMLA retaliation case.[27]

---

[27] Additionally, Plaintiff arguably fails to satisfy the first two prongs—invoking her right to FMLA leave and suffering an adverse employment decision related to that invocation. As the undisputed record suggests, Ms. Acevedo completed her report recommending Plaintiff's termination prior to Plaintiff's request for FMLA leave. (D-SOF ¶ 39; Resp. to D-SOF ¶ 39.) This report, even if not finalized by AHS HR, likely constitutes the key "adverse employment action" taken by the Defendants. *See Budhun*, 765 F.3d at 257–58 (explaining that an employer's actions "short of termination" can qualify as adverse employment actions). This adverse employment action occurred *before* Plaintiff invoked her right to FMLA leave,

Even if Plaintiff's reliance on the reed-thin fact of her termination's timing is sufficient to make out a prima facie case of FMLA retaliation, she also has not met her burden under *McDonnell Douglas*.[28] As detailed above, Defendants have satisfied their "minimal burden" to articulate a legitimate, non-discriminatory reason for their decision to terminate Plaintiff: namely, the August and December 2020 patient complaints and scheduling errors. *Lichtenstein*, 691 F.3d at 302. And again, Plaintiff fails to meet her burden to show that Defendants' cited bases are pretext. In addition to the reasons articulated above, Plaintiff offers no evidence—aside from the timing of her termination—to undermine Defendants' stated reasons for termination and indicate that she "would not have been fired absent her taking of leave." *Id.* at 311 (quoting *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001)); *see also Shay v. Homitz*, No. 23-3507, 2025 WL 1550099, at *5 (E.D. Pa. May 30, 2025). On the contrary, the only evidence in the record regarding Defendants' reaction to Plaintiff's request for leave suggests that Defendants quickly granted Plaintiff's request and did not interfere with her requested extensions in any way. (D-SOF ¶¶ 62, 64, 67–68; Resp. to D-SOF ¶¶ 62, 67–68; Opp. at 21 n.3; P-SSOF ¶ 84; Resp. to P-SSOF ¶ 84; ECF No. 37-2 at 126.) Because Plaintiff has not raised a genuine dispute of material fact that

---

suggesting that Plaintiff is unable to satisfy either one or both of these prima facie elements in connection with her leave. However, because courts that resolve this pre-leave termination issue typically do so as part of the causation prong and the Court is otherwise satisfied that Plaintiff's FMLA claims must be dismissed, the Court need not decide the question. *See, e.g.*, *Atchison*, 666 F. Supp. 2d at 490–91.

[28] Both parties focus only on whether Plaintiff has met her initial burden to articulate a prima facie case of FMLA retaliation, but neither party addresses the remaining steps of the *McDonnell Douglas* burden-shifting framework—that is, Defendants' non-discriminatory justification and Plaintiff's assertion of pretext. (*See* MSJ at 6–9; Opp. at 21–25.) This omission aside, the Court will rely on the parties' arguments regarding the NJLAD claims, which proceed under the same *McDonnell Douglas* framework. *See Kohler v. TE Wire & Cable LLC*, No. 14-3200, 2016 WL 1626956, at *4 (D.N.J. Apr. 25, 2016) (explaining that NJLAD and FMLA claims follow identical burden-shifting frameworks); (*see also* MSJ at 10 (arguing that AHS's decision to terminate was for "legitimate, non-discriminatory *and non-retaliatory* reasons" (emphasis added)); Opp at 16–17 ("Defendants cannot establish by a preponderance of the evidence that their claimed legitimate, nondiscriminatory reasons for Ms. Jussen's termination were not pretext for unlawful discrimination in violation of the LAD, *or the FMLA*." (emphasis added)).)

31

Defendants' decision to terminate her was related to her leave of absence, summary judgment is also appropriate with respect to Plaintiff's FMLA claims.[29]

---

[29] Both Plaintiff's NJLAD and FMLA claims may also proceed under a "mixed-motive" framework as articulated by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Myers v. AT&T*, 882 A.2d 961, 968 (N.J. Super. Ct. App. Div. 2005) (NJLAD); *Egan v. Del. River Port Auth.*, 851 F.3d 263, 274 (3d Cir. 2017) (FMLA). "In order to trigger a mixed-motive framework, 'a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [a protected characteristic] was a motivating factor for any employment practice.'" *Tolan v. Temple Health Sys. Transp. Team, Inc.*, 557 F. App'x 132, 138 (3d Cir. 2014) (alteration in original) (emphasis omitted) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). Although Plaintiff does not affirmatively raise this theory in her briefing for either claim, the Third Circuit has stated that district courts are nonetheless "required to determine whether a *Price Waterhouse* analysis is legally applicable" even if not raised at summary judgment. *Magnusson v. The Hartford*, 258 F. App'x 444, 446 n.3 (3d Cir. 2007). Nonetheless, because "[t]he record before [the Court] is bereft of direct evidence strong enough to mandate a mixed motive analysis," nor to create a triable issue of fact under such an analysis, neither of Plaintiff's claims survive summary judgment on this alternative theory either. *Id.* at 447. As discussed hereinabove, Plaintiff has not presented any evidence to suggest that "a discriminatory attitude was more likely than not a motivating factor" for her termination, and none of her evidence is "connected to the decision being challenged by the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting and citing *Walden v. Ga.-Pac. Corp.*, 126 F.3d 506, 513, 515–16 (3d Cir. 1997)); *see also Tolan*, 557 F. App'x at 138 (holding that district court's decision to "decline[] to analyze the facts of this case using a mixed-motive rubric" was appropriate where plaintiff offered limited evidence of discrimination). Accordingly, under either framework, Plaintiff's claims must still be dismissed.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 36). An appropriate Order accompanies this Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: March 13, 2026